# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 4, 2011

## STATE OF TENNESSEE v. JERRY WILLIAMS

**Appeal from the Criminal Court for Shelby County**
**No. 10-02208      John T. Fowlkes, Judge**

---

**No. W2010-02457-CCA-R3-CD  - Filed November 18, 2011**

---

A Shelby County Criminal Court jury convicted the defendant, Jerry Williams, of alternative counts of aggravated assault.  The trial court ordered the convictions merged and imposed a Range I sentence of five years' incarceration.[1]  In this appeal, the defendant challenges the sufficiency of the convicting evidence and the propriety of the five-year sentence.  Discerning no error, we affirm.  We remand the case, however, for the entry of a single judgment of conviction reflecting the merged convictions.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Phillis Aluko (on appeal); and Dianne Thackery (at trial), Assistant District Public Defenders, for the appellant, Jerry Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jose Leon and Theresa McCusker, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

        The Shelby County grand jury charged the defendant with aggravated assault via a deadly weapon and aggravated assault via serious bodily injury for his August 15, 2009 attack on the victim, Alvin Payne.

---

[1]Despite recognizing that the convictions should be merged, the trial court nevertheless imposed concurrent five-year sentences and entered two judgments of conviction.

On August 15, 2009, the victim went to the home of his cousin, Sam Wesby, to visit with Mr. Wesby and several others who lived at the residence. At approximately 9:00 p.m., Mr. Wesby indicated that he was going to bed, and the victim told the group, which included the defendant, that he was "going to ease on to the house." The victim recalled that as he left the residence, the defendant was outside alone smoking a cigarette. The victim said that the defendant asked him for a cigarette, and the victim responded that he had none and began walking toward his car. Before he reached his car, the victim heard "a lump" or "a clunk" inside his head before losing consciousness. The victim said that he awoke briefly after being placed on a stretcher but did not fully regain consciousness until he was in the hospital.

The victim testified that he suffered a fractured skull that required a lengthy hospital stay and that caused a mild stroke, leaving him with only partial use of his right arm. After an initial release from the hospital, the victim was readmitted after he began having seizures and confusion. He said that the lasting effects of the injury caused him to lose his job as a truck driver.

The victim admitted having a "fingernail cleaner type pocket knife" with him at the time of the assault, but he maintained that he never threatened the defendant. He insisted that he and the defendant did not have a heated exchange prior to the offense.

The victim's medical records confirmed that he suffered "[f]ractures of the left frontal, parietal and temporal skull" as well as a "[r]ight orbital roof fracture." Surgery was required to repair the skull fracture. He was discharged from the hospital after five days but readmitted a week later.

Sam Wesby, Jr., testified that the victim came to his residence to visit on August 15, 2009. The victim stayed for a few hours, and when he decided to leave, Mr. Wesby walked with him onto the porch. At that point, the defendant was leaning against "a telegram post" holding "a shovel in his left hand and a brick in his right hand." As the victim walked toward his car, the defendant "throwed [sic] the brick and [the victim] fell to the ground." Mr. Wesby described the brick as "just about big enough to fit your hand like you going to throw a baseball or something." He said that the brick struck the victim "to the side of his head and it sounded like a pistol went off it was throwed [sic] so hard." After throwing the brick, the defendant ran away, and Mr. Wesby and others helped the victim onto the porch.

Mr. Wesby testified that he neither saw nor heard any confrontation between the defendant and the victim prior to the defendant's throwing the brick. He said that when he cleaned the area on the following day, he did not find a razor blade, knife, or any other

weapon in the vicinity where the victim fell.

Audrey Vines testified that she and her fiancé were sharing a residence with Mr. Wesby and his wife on August 15, 2009. The defendant, whom Ms. Vines described as her "godson," was staying at the residence. On that night, the victim came to visit along with some others. At the end of the evening, the victim left, and Ms. Vines walked onto the porch as he was leaving. As she stood on the porch, Ms. Vines saw the defendant throw a brick and strike the victim in the head. She recalled that after throwing the brick, the defendant shouted that he was "not wrong" and ran away. The defendant also claimed that the victim had threatened him. Ms. Vines said that others helped the victim onto the porch while she telephoned 9-1-1.

After his arrest, the defendant telephoned Ms. Vines and told her that he was "going to get [her]" because it was her fault that he had been arrested and charged in this case.

Officers found the defendant hiding in a residence several days following the assault.

The defendant testified that the victim and others were drinking and playing cards on August 15, 2009, but he was not drinking that evening. He said that at one point, Ms. Vines asked him to go outside with her to get more cigarettes, and the victim followed them onto the porch "acting real belligerent." The defendant said that Ms. Vines went inside, and the victim attacked him, grabbing him "by the back of [the] neck" and attempting to stab him with a small pocket knife. During the altercation, the defendant fell into some hedges scraping his arm. The victim went inside, and the defendant armed himself with a shovel and a brick.

The defendant claimed that when the 59-year-old victim came back outside a short time later, he attacked the 29-year-old defendant a second time, leaping from the porch "like in the Michael Myers scene" and threatening him with the small pocket knife. The defendant said that he then threw the brick in self-defense and ran away.

At the conclusion of the proof, the jury convicted the defendant as charged of two counts of aggravated assault. At the sentencing hearing, the trial court attempted to merge the convictions, noting that "[t]he charges will be combined"; however, it ordered separate but concurrent sentences of five years in the Department of Correction.

In this appeal, the defendant challenges the sufficiency of the convicting evidence and the propriety of the sentence imposed.

*Sufficiency*

The defendant contends that the evidence was insufficient to support his convictions because the State failed to establish that he used a deadly weapon and "failed to disprove the defendant's theory of self-defense." The State asserts that sufficient evidence undergirds each conviction.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and . . . [c]auses serious bodily injury to another [or] [u]ses or displays a deadly weapon." T.C.A. § 39-13-102(a)(1)(A) (2006). "A person commits assault who [i]ntentionally, knowingly or recklessly causes bodily injury to another; [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury; or [i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." *Id.* § 39-13-101(a). "'Deadly weapon' means . . . [a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(5). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(2). "'Serious bodily injury' means bodily injury that involves [a] substantial risk of death; [p]rotracted unconsciousness; [e]xtreme physical pain; [p]rotracted or obvious disfigurement; [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or [a] broken bone of a child who is eight (8) years of age

-4-

or less." *Id.* § 39-11-106(34).

The evidence adduced at trial established that the defendant threw a brick at the victim, striking him in the head and causing a skull fracture. The injury caused the victim to lose consciousness for a protracted period of time and led to a substantial impairment of the use of his right arm. As a result of his injury, the victim was unable to continue working as a truck driver. The brick, as it was used in this case, qualifies as a deadly weapon. The jury heard and rejected the defendant's claim of self-defense; indeed, the overwhelming weight of the evidence belies the defendant's self-defense claim. Under these circumstances, the evidence was sufficient to support the defendant's convictions of aggravated assault.

Because the imposition of two convictions of aggravated assault would violate principles of double jeopardy, the verdicts must be merged into one conviction with one conviction judgment. The trial court recognized the necessity for merger but did not properly effectuate it. As a result, the case must be remanded for the trial court to merge the convictions. On remand, the trial court should enter a single judgment of conviction reflecting the merged offenses and a single five-year sentence.

## II. Sentencing

The defendant also challenges the sentence imposed by the trial court, arguing that the five-year term is excessive and that the trial court erred by ordering a fully incarcerative sentence. The State contends that the sentence is appropriate.

At the sentencing hearing, the defendant presented the testimony of Jeffery Futrell, president of Young Man University, an organization Mr. Futrell described as working to provide "professional life training, skill training, [and] job training" to young men convicted of crimes. Mr. Futrell testified that although the defendant had not been officially granted entry into the program, it appeared that he was a qualified applicant.

The defendant testified that if granted probation he intended to enroll in the Young Man University program and reside in one of the program's residential units. He said that he wanted to get his life back together, including obtaining his GED, getting a job, and fulfilling his child support obligation for his five children.

The defendant apologized to the victim and stated that he did not "hold any grudges" against the victim. The defendant claimed that he was not angry about having been "maliciously prosecuted" or about the attempt by the State and the victim to "defame [his] character." He maintained that he "was right in what [he] did" because the victim tried to kill him. He said, "I'm the victim. He's the assailant." The defendant explained that the

victim should have been prosecuted for attempting to kill him. The defendant also took issue with a previous finding that he violated his probation, stating, "I didn't violate no probation. . . . I just . . . didn't report."

The defendant claimed that although he had never paid child support to the mothers of his five children, he had "been a perfectly good father to" them. He said that he wanted to provide his children with a better life but could not do so while incarcerated.

Based upon the evidence presented at the hearing and that contained in the presence report, the trial court ordered a sentence of five years to be served in the Department of Correction. The trial court denied any form of alternative sentencing, citing the defendant's criminal history, sporadic work history, previous probation revocation, failure to accept responsibility, and the circumstances of the offense as warranting a fully incarcerative sentence.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court must consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the

mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

Relative to the defendant's Class C felony conviction of assault, he was considered a favorable candidate for alternative sentencing. *See id.* § 40-35-102(6). "[F]avorable status consideration," however, does not equate to a presumption of such status. *Carter*, 254 S.W.3d at 347.

As the recipient of a sentence of ten years or less, the defendant was also eligible for probation. *See* T.C.A. § 40-35-303(a). He bore the burden, however, of establishing his "suitability for full probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b). Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978).

Here, the trial court imposed a five-year sentence based upon its finding that the defendant's record of criminal convictions exceeded that necessary to establish the appropriate range. *See* T.C.A. § 40-35-114(1). Contrary to the defendant's assertion, the trial court did not apply enhancement factors based upon either the defendant's use of a deadly weapon, *see id.* § 40-35-114(9), or the seriousness of the victim's injuries, *see id.* § 40-35-114(6). Instead, the trial court concluded that the seriousness of the defendant's previous convictions warranted a sentence enhancement of two years.

The trial court ordered that the defendant serve the entire sentence in the Department of Correction, finding that the defendant's prospect of rehabilitation was "very poor" given his criminal history, failure to accept responsibility for the offenses, and previous history of a probation revocation and that confinement was necessary to avoid depreciating the seriousness of the offense given that the victim was permanently disabled as a result of the injuries sustained at the defendant's hand.

The record supports the findings of the trial court. The defendant's criminal record includes convictions of aggravated criminal trespass, vandalism, drug possession, and carrying a concealed firearm. His criminal history also includes a revocation of his probation only months before the assault in this case. The defendant failed to accept full responsibility for the victim's serious and debilitating injuries, maintaining that he had been "maliciously prosecuted," and failed to accept any accountability for the prior probation revocation. The defendant's criminal history justified his sentence of five years. Furthermore, his recent unsuccessful attempt at probation and the need to avoid depreciating the very serious nature of the offense supported the imposition of a fully incarcerative sentence. *See id.* § 40-35-103(1)(B),(C).

*Conclusion*

The judgment of the trial court is affirmed. The case must be remanded, however, for the imposition of a single judgment of conviction reflecting the merged convictions of aggravated assault and a single five-year, incarcerative sentence.

_____
JAMES CURWOOD WITT, JR., JUDGE